GUCKENBERGER, A TAXPAYER, V. DEXTER ET AL.

1. AUTHORITY OF SINKING FUND TRUSTEES UNDER SEC. 2729a, REV. STAT.
   Section 2729a, Rev. Stat., with the limitations imposed by it, gives the sinking
   fund trustees of the city of Cincinnati, full authority to refund the bonded
   indebtedness of said city at a lower rate of interest.
2. AUTHORITY OF TRUSTEES OF CINCINNATI SOUTHERN RAILROAD, UNDER ACT
   OF 1898.
   The act of April 25, 1898, sec. 2, (93 O. L., 672), authorizes the trustees of the
   Cincinnati Southern Railway "by a proper indorsement or stamping on any
   of the outstanding bonds and coupons thereof," issued by the city of Cin-
   cinnati for the building of said railway, to extend the time of payment of
   such bonds, at a lower rate of interest: *Held*, that while said act does not
   use the word "refund," but uses the phrase, "extend the time of payment," it
   provides a scheme by which the railway trustees may virtually refund the
   bonds of said city issued for the construction of said railway.
3. ACT OF APRIL 25, 1898, DOES NOT IN TERMS REPEAL SEC. 2729a, REV. STAT.
   The act of April 25, 1898, (93 O. L., 672), being the last expression of the legis-
   lature on the subject of refunding these bonds, does not in terms repeal
   sec. 2729a, Rev. Stat., and there is not necessarily any conflict between them,
   and they may both stand, with each board having a right to refund these
   bonds, with the limitation that whichever board acts first and refunds the
   bonds, exhausts the power and thus deprives the other of the right to per-
   form the same act. Both bodies cannot do the same act, but either may.
4. CONTRACT TO REFUND SUCH INDEBTEDNESS MUST BE PERFORMED WITHIN A
   REASONABLE TIME.
   Any contract made by either board, looking to the refunding of these bonds,
   must have a reasonable operation with a view to respecting the rights of
   either to perform the same act, and any contract of this kind to be binding,
   must not in its nature be prospective to an unreasonable time as to its fulfill-
   ment; and, therefore, a contract which is not to be performed within three,
   four or five years is unreasonable as to time.
5. WHAT WILL AMOUNT TO AN UNREASONABLE EXERCISE OF THE RIGHT TO
   CONTRACT WITH REFERENCE TO REFUNDING SUCH BONDS.
   Where, under the provisions of the statute as above set forth, the sinking fund
   trustees make a contract with certain bankers for the purpose of refunding
   the bonds heretofore mentioned, and such contract does not actually refund
   any bonds, but merely provides for what may be done; and in effect takes
   away from the other board the right to perform the same duty, so that such
   other board could not refund these bonds for a period of more than three
   and one-half years, and yet not a single bond be refunded: *Held*, that this is
   an unreasonable exercise of the right to contract with reference to the
   refunding of these bonds. For while not refunding any bonds, the sinking
   fund trustees have prevented the Southern Railway trustees from exercising
   an equal, if not a better right given them by the law. For this reason this
   contract is invalid as to the bonds given for the construction of the Southern
   Railway.
6. FAILURE TO COMPLY WITH SEC. 2709, REV. STAT.
   Section 2709, Rev. Stat., applies to the sale of bonds which are necessary to
   refund a debt; and therefore, where the sinking fund trustees under sec.
   2729a, Rev. Stat., enter into a contract for the sale of such bonds for the
   purpose of raising money to pay the outstanding bonds, and the refunding
   scheme is carried out in this manner, without complying with the provisions
   of sec. 2709, Rev. Stat., as to advertising for bids and sale of said bonds to
   the highest and best bidder, renders such contract void.

7. Increase of Indebtedness of a City Beyond Limit Allowed by Statute.

Section 2729a, Rev. Stat, provides that the aggregate amount of bonds issued by the trustees in refunding the debt of the city shall not exceed twenty-six million dollars; and, therefore, where such refunding contract as executed by such trustees increased the bonded indebtedness of such city over three million dollars; although at a lower rate of interest, renders such contract void.

Error to the Court of Common Pleas of Hamilton county.

Swing, J.

This is an action to restrain the defendants from performing a certain contract theretofore made by said defendant, trustees of the sinking fund of the city of Cincinnati, with Roberts & Company, bankers of New York city, concerning the refunding of $15,610,000 of the bounded debt of said city.

This contract is as follows:

"Agreement made this fifteenth day of June, 1898, between Roberts and Company, a corporation organized under the laws of the state of New York, and doing business in the city of New York in said state (hereinafter called the bankers), parties/of the first part, and the trustees of the sinking fund of the city of Cincinnati, in the state of Ohio, (hereinafter called the trustees) parties of the second part:

"Whereas, there are now outstanding approximately the following amounts of the following issues of bonds of the city of Cincinnati (hereinafter called outstanding bonds), that is to say,

| | |
|---|---:|
| "Cincinnati Southern R. R. 7 per cent. bonds maturing in 1902, say | $494,000 |
| "Cincinnati Southern R. R. 7 3-10 per cent. bonds maturing in 1902, say | 7,644,000 |
| "Cincinnati Southern R. R. 6 per cent. bonds maturing in 1906, say | 2,890,000 |
| "Cincinnati Southern R. R. 7 3-10 per cent. bonds maturing in 1906, say | 1,860,000 |
| "Cincinnati Southern R. R. 7 per cent. bonds maturing in 1908, say | 835,000 |
| "Cincinnati Southern R. R. 6 per cent. bonds maturing in 1909, say | 895,000 |
| "Founding Floating Debt, 7 per cent. bonds maturing in 1904, say | 992,000 |
| "Total amount outstanding estimated at | $15,610,000 |

"And, Whereas, the trustees, by virtue of the powers now vested in them, and the legislation hereafter to be had amending or supplementing the same, propose to refund the outstanding balances of the issues aforesaid, whatever the same may be, in Cincinnati consolidated sinking fund bonds (hereinafter called refunding bonds), of the character described in secs. 2729a and 2729b of the Revised Statutes of Ohio, or authorized by subsequent legislation; and

"Whereas, The bankers have proposed to purchase a sufficient number of said refunding bonds to refund said outstanding bonds upon the terms hereinafter stated:

"Now, therefore, this agreement witnesseth, that the trustees agree to sell and deliver to the bankers, and the bankers agree to buy and ac-

Guckenberger v. Dexter et al.

cept from the trustees, so many of the refunding bonds hereinafter de-
scribed as can be lawfully issued and shall be necessary to be sold to
provide for the refunding of the several issues of bonds above described,
subject to the following reservations and conditions:

"1.   All the refunding bonds to be tendered to and purchased by the
bankers under this agreement shall be regularly and legally issued;
shall bear date the first day of January or of July of the year in which
they are so purchased by the bankers; shall be payable in the city and
state of New York; shall bear interest at the rate of three and one-half per
centum per annum, payable semi-annually; and shall become due fifty
years, and be redeemable thirty years from date. If coupon bonds, they
shall be of the denominations of one hundred dollars, five hundred dol-
lars, and one thousand dollars in such lots or portions as the
bankers ·may designate.    If registered bonds, they shall be of
the denomination of one thousand dollars, or such multiple thereof
and in such lots or portions as the bankers may designate.   The bankers
may require that each delivery be made in coupon bonds or in registered
bonds, or partly in coupon bonds and partly in registered bonds, in such
proportions as they may designate; and all such coupon bonds shall be
exchangeable for registered bonds at the demand of the holder thereof,
if tendered in sums of one thousand dollars or a multiple thereof.

"2.   For the refunding bonds thus to be purchased by the bankers,
they shall make payment at the time of the delivery in the manner here-
inafter provided, either in cash, or in outstanding bonds of the issues to
be refunded.   If said payment be in cash, it shall be the par value of the
bonds thus paid for, with accrued interest until the time of such pay-
ment.   If such payment be in outstanding bonds, the same shall be
accepted by the trustees at prices which would yield or represent to the
city of Cincinnati in annual return of three and one-half per centum per
annum upon the cost of said bonds to said city, said price and said
annual return to be figured in accordance with 'Price's Stock Values,'
the number of days, months and years in such computation to be the un-
expired term between the date of the delivery of said outstanding bonds
by the bankers to the trustees and the date of the maturity thereof.   As
it is probable that the larger part of the outstanding bonds delivered by
the bankers to the trustees will be delivered by them before maturity,
and therefore, at a premium over and above the par value of said bonds,
such premium may, at the option of the trustees, be paid in cash or in
refunding bonds, or partly in each.

"3.   The bankers may only purchase refunding bonds for cash with-
in ninety days next before the maturity of each of the issues first above
mentioned, and then only to the amount of outstanding bonds maturing
within said ninety days.   Unless enough bonds of any issue to be re-
funded have been delivered to the trustees prior to ninety days before
the maturity of such issue to satisfy the trustees that means of payment
of the outstanding bonds of such issue will be provided by the bankers
·in cash on or before maturity, the trustees shall be at liberty to take such
proceeding to provide the required money as to them may seem neces-
sary.

"All outstanding bonds above described as and when acquired by
the bankers shall be by them promptly tendered to the trustees.   Upon
such tender by the bankers to the trustees of any  of  the  outstanding
bonds more than ninety days before the maturity of the bonds so ten-
dered, the trustees shall accept the bonds so tendered, and pay the par

value thereof, and the premium, if any, thereon, with refunding bonds and cash as above provided.

"If the bankers shall fail to deliver said outstanding bonds under this contract to the trustees in amounts and at times as follows, viz: not less than five hundred thousand dollars on or before the first day of January, 1899; not less than one million dollars, on or before the first day of July, 1899, not less than one million, five hundred thousand dollars on or before the first day of January, 1900; not less than two million dollars on or before the first day of July, 1900; not less than two million five hundred thousand dollars on or before the first day of January, 1901; not less than three million dollars on or before the first day of July, 1901, and not less than three million, five hundred thousand dollars on or before the first day of January, 1902, then, and upon such failure, and at any time while the same continues, and notwithstanding a prior failure of similar nature may have been waived, the trustees may at their option, terminate this contract by giving thirty days written notice to the bankers of their election so to do; and such termination shall absolutely discharge and put an end to this agreement and the rights and liabilities of all parties and their assigns thereunder, and shall release the bankers and their assigns from all damages and claims for damages whatsoever, upon or arising out of this contract or any part thereof.

"4. In case the state of Ohio shall, on or before the first day of July, 1900, enact legislation authorizing the trustees to issue refunding bonds of said city of Cincinnati maturing fifty years after date without privilege of redemption at an earlier period, and payable both as to principal and interest in such kind of lawful money as the trustees may determine, for the purposes specified in section 2729a, of the Revised Statutes of Ohio, as the same now provides or may hereafter be amended, the trustees shall issue and deliver, and the bankers shall purchase and receive, refunding bonds maturing fifty years after date as aforesaid, and payable both as to principal and interest in gold coin of the United States, of or equal to the present standard of weight and fineness, and in other respects of the same character as the bonds described in article 1, and upon payment therefor in outstanding bonds or cash of a premium of one per centum of the par value thereof, in addition to the par value and accrued interest from the date of the bonds until the time of such payment.

"5. All bonds deliverable by or to the trustees under this contract shall be received and paid for in either the city of Cincinnati or the city of New York, as may be elected by the bankers with reference to each delivery.

"6. On or before the first day of January, 1899, the bankers shall present to the trustees evidence satisfactory to the trustees that a sufficient proportion of this contract has been executed by the bankers or their assigns approved by the trustees, or has been assigned to and assumed by assignees, similarly approved whose responsibility is satisfactory to said trustees, to assure the provision for that portion of the debt described herein which matures in the year 1902.

"On or before the first day of January, 1904, the bankers shall present to the trustees evidence satisfactory to the trustees that the remaining part of this contract has been sufficiently executed by the bankers or their assigns, approved by the trustees, or has been assigned to and assumed by assignees similarily approved whose responsibility is satisfac-

tory to the trustees to assure the provision for that portion of the debt described herein, which matures after the first of January, 1904.

"If the bankers fail to present evidence satisfactory to the trustees in accordance with either of the two paragraphs hereof next preceding, then, and in either such event, and at any time thereafter before such satisfactory evidence shall have been presented, the trustees may at their option terminate this contract by giving thirty days written notice of their election so to do to the bankers; and such termination shall absolutely discharge and put an end to this agreement, and the rights and liabilities of all parties and their assigns thereunder, and shall release the bankers and their assigns from all damages and claims for damages whatsoever upon or arising out of this contract or any part thereof.

"7. The bankers may assign to responsible parties, satisfactory to the trustees, this contract as to all of said bonds or any part or parts thereof, such assignees assuming and agreeing to perform all the stipulations of the bankers herein to the extent of the interest assigned to them respectively. Copies of every such proposed assignment shall be forthwith filed with the president of the trustees, and no such assignment shall take effect until the same shall have been approved by the trustees.

"8. The trustees contract only in their official capacity, and in no event are they or any of them to be individually liable because thereof; and the bankers bind themselves, their successors and assigns.

"In witness whereof, hereto, and to a duplicate hereof the parties of the first part have cause their name to be signed by William Edward Coffin, their general manager, thereunto duly authorized, and the parties of the second part have caused the same to be signed by Julius Dexter, their president, the day and year first above written.

"Roberts and Company
"By W. E. Coffin,
"General Manager.
"The Trustees of the Sinking Fund
"of the City of Cincinnati, by
"Julius Dexter,
"President."

It is claimed by the plaintiff that in making this contract the said trustees exceeded their authority in that, by it, the bonded indebtedness of the said city is increased over three million of dollars, and that in fact, the contract really contemplates a sale of the bonds by the trustees rather than a refunding. And further, that by the contract the Cincinnati Southern Railway Trustees are deprived of the right to refund the bonds issued by the city for the building of said railway, which by the law of 1898 (93 O. L., 672), they are authorized to do.

The right to make this contract is claimed by said trustees by virtue of sec. 2729a, Rev. Stat., which section is as follows:

"The sinking fund commissioners in cities of the first grade of the first class, for the purpose of refunding the bonded debt, exclusive of street improvement bonds, of the city for which such trustees act, at a lower rate of interest, and for the purpose of buying the fee simple of real estate held by the city under perpetual leases, wherein is secured to the city the option to buy the fee simple at a fixed price, and where the money to buy can be procured at a smaller rate of interest on the price than is represented by the stipulated rents, shall have power to make and issue the bonds of such city, with coupons or registered, due fifty years,

and redeemable thirty years from date, bearing interest at a rate not greater than five per centum per annum, payable semi-annually, to an aggregate amount not exceeding twenty-six million of dollars, to be known as————consolidated sinking fund bonds.

"The bonds shall be signed by the president of the trustees of the sinking fund, countersigned by the auditor of the city, and have the seal of the city issuing them affixed."

This section, with the limitations imposed by it, undoubtedly gives the sinking fund trustees full authority to refund the bounded indebtedness of said city. The act of April 25, 1898, supra, sec. 2, is as follows:

"The trustees of the said railway are hereby authorized by a proper endorsement or stamping on any of the outstanding bonds, and the coupons thereof, issued under the act to which this is supplementary, to agree to an extension of time of payment of said bonds for a period not to exceed forty years from the maturity thereof, upon the holders of such portion of said bonds, as said trustees may agree with, agreeing to reduce the interest thereof to such rate as said trustees shall fix, not exceeding three and a half per centum per annum; and said trustees are hereby further authorized to cause to be engraved, printed and attached to such bonds, such additional coupons as may be necessary to evidence the interest to be paid for the extended time of payment of said bonds. Any expense incurred by reason of the extension aforesaid shall be paid by the city treasurer, upon the order of the board of trustees of such railway out of any income derived from said railway."

While this act does not use the word "refund," but uses the phrase, "extend the time of payment," it provides a scheme by which the railway trustees may virtually refund the bonds of said city issued for the construction of said railway; and while this is the last expression of the legislature on the subject of refunding these bonds, it does not in terms repeal sec. 2729a, supra, and we are of the opinion that there is not necessarily any conflict between them, and that they may stand, with each board having a right to refund these bonds, with the limitation that whichever board acts first and refunds the bonds, exhausts the power and thus deprives the other of the right to perform the same act. Both bodies can not do the same act, but either may.

It is apparent then, that it is of first importance to ascertain whether by this contract, the sinking fund trustees have in a proper manner provided for the refunding of these particular bonds, for it will be noticed, that all the bonds provided for in the contract, except nine hundred and ninety-two thousand dollars, are Southern Railway bonds; for it would seem evident, if both boards are to have the right to refund these bonds, any contract made by either, looking to the refunding of these bonds, must have a reasonable operation with a view to respecting the rights of either to perform the same act, and it seems to us clear, that any contract of this kind to be binding, must not in its nature be prospective to an unreasonable time as to its fulfillment. It would be reasonable to hold that it would not be absolutely necessary that the contract should be executed before it would be protected, for it might be that a contract of such magnitude, and necessarily somewhat complex, at the best requiring considerable time for performance, should be given considerable time for performance, for it would hardly be probable that a contract concerning this amount could be performed in a few days, or even a few weeks. At the same time, a contract which is not to be performed within three, four or five years would seem to be unreasonable as to time.

When it is considered if the contract is valid and it does not actually refund any bonds, but merely provides for what may be done, that it in effect, takes away from the other board the right to perform the same duty, it would be difficult to see how the equal right of each board to refund, granted by the legislature, can be maintained if either board may forestall the other by making a contract to refund at an unreasonable and distant period.

It thus becomes important, in this view, to ascertain, first, what each part has agreed to do by this contract. The contract recites that the sinking fund trustees propose to refund the bonds theretofore enumerated, and that the bankers propose to purchase a sufficient number of refunding bonds to refund said outstanding bonds, and then follows the following provision: "That the trustees agree to sell and deliver to the bankers, and the bankers agree to buy and accept from the trustees * * * subject to the following conditions." Then follows certain provisions in regard to the place of payment, denomination and character of bonds. Then follow these provisions:

"For the refunding bonds thus to be purchased by the bankers, they shall make payment at the time of delivery either in cash or outstanding bonds of the issue to be refunded. If said payment be in cash, it shall be the par value of the bonds. * * * If such payment be in outstanding bonds, the same shall be accepted by the trustees at prices which would yield or represent to the city of Cincinnati, an annual return of three and a half per centum per annum upon the cost of said bonds to the said city * * * as it is probable that the larger part of the outstanding bonds delivered by the bankers to the trustees will be delivered by them before maturity."

Article 3, of the contract provides that the bankers may only purchase refunding bonds for cash within ninety days next before the maturity of each of the issues first above mentioned, and then only to the amount of outstanding bonds maturing within said ninety days, and if this is not done, the trustees may proceed as to them may seem necessary to provide the required money.

All outstanding bonds described as, and when acquired by the bankers, shall be by them promptly tendered to the trustees. Upon such tender by the bankers to the trustees of any of the outstanding bonds more than ninety days before the maturity of the bonds so tendered, the trustees shall accept the bonds so tendered, and pay the par value thereof, and the premium, if any, thereon with refunding bonds or cash as above provided."

In this article it is provided that if the bankers shall fail to deliver bonds at certain times and to certain amounts, the trustees may, at their option, terminate the contract. The bonds to be tendered in this provision is commencing with January 1, 1899, and concludes January 1, 1902, covering a period of three years, within which time, three million, five hundred thousand dollars is in contemplation of delivery at least. The sixth article provides that on or before January 1, 1904, the bankers shall present to the trustees evidence satisfactory to the trustees that the remaining part of this contract has been sufficiently executed by the bankers for that portion of the debt which matures after January 1, 1904.

It will thus be seen that this contract in any event, may run, if the bankers so desire, for a period of five years, provided they comply with the purchase of outstanding bonds in the amounts therein specified, and whether or not a bond is delivered to the trustees more than ninety days before the maturity of the debt due in 1902, the contract may continue

9 O. C. D. 43

until that time, if the trustees do not terminate the contract. For it will be noticed that the bankers do not agree to turn in any outstanding bonds at any time. All the bankers agree to do is:

"And the bankers agree to buy and accept from the trustees so many of the refunding bonds hereinafter described as can be lawfully issued and shall be necessary to be sold to provide for the refunding of the several issues of bonds above described, subject to the following reservations and conditions."

The next provision that they agree to do is, to turn over to the trustees promptly any outstanding bonds that they may have purchased, but the bankers nowhere agree to purchase/any outstanding bonds. If the bankers do not deliver to the trustees the bonds at the time, and in the amounts therein specified, the trustees may terminate the contract, but the trustees may not exercise this privilege; and if they should not, this contract would be in force for more than three years and a half and not a bond be refunded, for the bankers have not agreed to deliver a single outstanding bond before that time. This statement in the contract, that, "As it is probable that the larger part of the outstanding bonds delivered by the bankers to the trustees will be delivered by them before maturity," comes far short of being an agreement to deliver any bonds. Ninety days before the maturity of the debt due in 1902, the bankers have agreed to buy from the trustees the bonds necessary to be issued to redeem the bonds due ninety days thereafter, and it is possible that this may include all the bonds then about to mature. The effect of such a contract would be, that for three and a half years not a bond would be refunded. It is no answer to this to say, that it is not likely to occur. It is sufficient to say that it may occur. This leaves out of view the further provision of the contract which as to certain bonds, extends the life of the contract certainly to January 1, 1904 and possibly until ninety days before the maturity of the debt due in 1909.

The fault with this contract is, that it does not refund any bonds. If valid and binding, it may tie the hands of the Southern Railway trustees, so that they may not refund these bonds for a period of more than three and one-half years, and yet not a single bond be refunded. It seems to us that this is an unreasonable exercise of the right to contract with reference to the refunding of these bonds. For while not refunding any bonds, the sinking fund trustees have prevented the Southern Railway trustees from exercising an equal if not a better right given them by the law. For this reason we think this contract invalid as to the bonds given for the construction of the Southern Railway.

Section 2709, Rev. Stat., provides that:

All sales of bonds other than to the sinking fund of any municipal corporation shall be to the highest and best bidder after thirty days' notice in at least two newspapers of general circulation in the county where such municipal corporation is situated, setting forth the nature, amount, rate of interest and the length of time the bonds have to run, and the time and place of sale."

We are of opinion that this section applies to the action of the sinking fund trustees under sec. 2729a Rev. Stat., if the refunding of the bonded debt under that section is accomplished by merely selling bonds to raise money in order to pay outstanding bonds when they mature. The language of the section is broad and comprehensive. It is, "all sales of bonds" and there can be no reason why this section should not apply to a sale of bonds which is necessary in order to refund a debt, any

Guckenberger v. Dexter et al.

more than it would be in order to raise money to meet any other obligation. The sale to the highest bidder after proper publication is necessary to the protection of the public. It is as requisite in one case as in the other. As to the wisdom of such a law there can be no question. Therefore, if this contract is a sale of bonds for the purposes of raising money to pay the outstanding bonds, and the refunding scheme is carried out in this manner, the contract can not stand.

What is the contract? The contract recites:

"Whereas, the bankers have proposed to purchase a sufficient number of such refunding bonds * :: * Now therefore, this agreement, witnesseth, that the trustees agree to sell and to deliver to the bankers, and the bankers agree to buy and accept from the trustees."

Evidently the contracting parties thereto thought the contract made was simply a contract to sell by the one party and a contract to buy by the other.

The fact that the contracting parties understood it to be a sale of bonds, would not necessarily make it such, provided what they did actually agree to do was not a contract to buy and sell bonds; but we are inclined to hold that the provisions of the contract relating to the buying by the bankers of outstanding bonds and delivering the same to the trustees, and receiving in return bonds of the city, is not a sale of bonds. But the defect in the contract is, that there is no agreement that any number of bonds will thus be refunded, and at the furthest it would not be more than one-half of the bonds to be refunded, and in fact, it is possible that all the bonds, might under this contract, be taken ninety days before the maturity of outstanding bonds, which, we think would be nothing else but a sale of bonds, and therefore this contract can not stand by reason of sec. 2709, Rev. Stat.

Under this contract it is possible that the interest bearing debt of the city may be increased by over three million dollars. Can this lawfully be done? Section 2729a, supra, provides that the aggregate amount of bonds issued by the trustees in refunding the debt shall not exceed twenty-six million dollars. The reason for this limitation becomes apparent when it is known that the bonded debt of the city at the time of the passage of this law was about twenty-six million dollars, including the bonds of the city then held by the sinking fund trustees. Therefore, if the entire debt of the city had then been refunded, there could have been no material increase in the interest bearing debt by reason of this limitation.

The last expression of the legislature on the debt created by the Southern Railway construction, supra, provides the manner in which these bonds may be refunded. The word used is "extended," but it is in effect a refunding scheme. By the terms of this act there can be no increase in the interest bearing debt. It would hardly be reasonable to suppose that if these two boards are given the same right to perform the same duty, that in regard to so important a matter as the increase of the bonded debt, bearing interest, that one might increase it when the other could not.

Taking these two acts together we are forced to the conclusion that the Southern Railway bonded debt can not be increased by any refunding scheme by either board, which increases the interest bearing debt, and for this reason also the contract is invalid.

*Peck & Shaffer*, and *F. Hertenstein*, for plaintiff.

*Lawrence Maxwell*, *J. B. Foraker*, and *Kinkead* of corporation counsel, for defendant.